IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  05-cv-02386-LTB-PAC

ROBERT S. MACH,

      Applicant,

v.

RON LEYBA, Superintendent A.V.C.F., and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents,

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Patricia A. Coan, United States Magistrate Judge

      Applicant Robert Mach, a state prisoner, brings a habeas corpus proceeding under 28 U.S.C. §2254.  A December 16, 2005 Order of Reference referred the Application to me to issue a recommendation on disposition.   Respondents filed their Answer on April 17, 2006.  Mr. Mach filed his Traverse on May 12, 2006.  A copy of the state court record was filed in this court on July 6, 2006.

I.

      Robert Mach was convicted by a Clear Creek County District Court jury of First Degree Murder in May 2001 for killing his wife, Mimi Mach.  He is serving a sentence of life imprisonment without possibility of parole.

A.    <u>The Trial</u>

The following is a summary of the evidence presented at Applicant's May 2001 trial.[1]  On the evening of May 29, 1994, Robert Mach ("Mach") sat down to dinner with his wife, Mimi Mach, and his step-daughter, Aime Palmer, at approximately 6:00 p.m., in the three-level Vail, Colorado townhouse where they lived with the Machs' infant daughter. According to Mimi Mach's daughter, Aime Palmer, Mach and Mimi began "bickering" at dinner about domestic issues.[2]  After dinner, Palmer retreated to her downstairs bedroom. Palmer's friend came over at approximately 7:00 p.m. and the two girls watched television in Palmer's room.  Palmer heard the arguing between Mimi and Mach continue until about 8:30 p.m.  When Palmer went upstairs to the kitchen shortly after 8:30 p.m., she saw Mimi sitting in the living room writing on a pad of paper.  Palmer did not see Mach. Mimi came down to Aime's room around 9:00 p.m. and asked Palmer to walk the dog.  Aime testified that Mimi did not appear to be angry.  Mimi took the dog for a short walk after Palmer said she didn't want to go out.  After Mimi returned, Palmer went upstairs a second time and saw Mimi typing on the computer in the living room.  Mimi appeared to be calm at that time. Again, Palmer did not see Mach.  Mimi went downstairs at approximately 10:00 p.m. to say goodnight to Palmer and her friend.  The girls went to bed between 11:00 and 11:30 p.m. (*See, generally,* R. Vol. 28, Testimony of Aime Palmer)

---

[1]Mach was tried originally in 1995.  His December 1995 conviction for first degree murder was reversed by the Colorado Court of Appeals in *People v. Mach*, 96CA428 (Colo. App. Sept. 24, 1998) (Unpublished). The case was remanded to the district court for a new trial.  (*Id.*)

[2]Palmer testified that her mother and Mach argued about legal issues concerning Mach's ex-wife approximately once a month, that her mother would yell during the arguments, that Mach seldom got angry or argued back in Palmer's presence, and that Mach was never violent.  (State Court Record ("R.") Vol. 28, Testimony of Aime Palmer)

Mach called 911 shortly after midnight to report that he had shot his wife.  (R. Vol. 28, Testimony of Barbara Gress)   Mach met the sheriff's deputies outside and told them that he was "the shooter", that his wife was in the bedroom, and that she was dead.  (*Id.*, Testimony of Flint Chambers; Testimony of Jeffrey Huff) One of the officers went upstairs to the third floor master bedroom and found Mimi lying naked on her stomach on the bed; she did not have a pulse.  (*Id.*, Chambers testimony) After the police arrested Mach, he told them that he and Mimi had been arguing for hours, that "she had got into his face, was talking about `divorce' and "wanted him to leave."  (*Id.*; Huff testimony) Mach said that he shot Mimi twice, but he did not know where.  (*Id.*)  Mach asked the officers to let him run and to shoot him in the back because he had done a "bad thing."  (*Id.*)  Mach was distressed and appeared to have been crying.  (R. Vol. 28, Chambers testimony)

 A police officer awakened Palmer, who had not heard the gunshots, and her baby sister, and took them to the Social Services Detention Center.  (R. Vol. 28, Palmer testimony)

Later that night, Mach told police during an interview at the police station that Mimi was intoxicated, that alcohol made her "wound up," that she was "constantly yelling at him," that Mimi told Mach he was a lousy husband and father, and that she wanted a divorce and for him to "get out."  (R. Vol.  29, Testimony of Michael McWIlliam)   In computer notes that Mimi typed that night, she accused Mach of associating with prostitutes, of being a "sick dog," and of being part of a family of convicts.  (*Id.*) Mimi also threatened to take Mach to California and "hang him," that she would "wipe him out," and warned him that he had "f------ with the wrong person."  (*Id.*) Some of the notes were found

on the floor, next to the night stand where Mach kept a gun. (R. Vols. 28 and 29, McWilliam testimony) Mach told the officer that Mimi had been lying in the middle of the bed yelling at him when he got out of bed to get dressed, grabbed the loaded gun from the night stand, a 9 mm, semi-automatic pistol, and shot her twice while standing at the end of the bed. (*Id.*; R. Vol. 29, Testimony of Alan Hammond) When police asked Mach when he decided to shoot Mimi, he responded, "I don't know, it just happened." (R. Vol. 29, McWilliam testimony)

Mach shot Mimi once in the chest and once in the forehead. (R. Vol. 29, Testimony of Dr. Ben Galloway) The forensic pathologist testified that the bullet fired into the victim's chest had gone through the heart and lungs and had been fired from a distance of six inches to two feet. (*Id.*) The pathologist further opined that Mach shot Mimi in the forehead from a distance of three to six inches. (*Id.*) Another prosecution expert testified that both shots were fired at less than eighteen inches away. (R. Vol. 29, Hammond Testimony) The prosecution's firearms and ammunition expert testified that the time required to fire two shots from the gun was less than one second. (*Id.*)

Mach's defense at trial was that he had acted upon a sudden heat of passion, but did not intend to kill his wife, or act after deliberation. Dr. Suzanne Bernhard, an expert in forensic psychology, testified for the defense. She interviewed Mach, reviewed tests administered by a previous doctor and conducted her own tests. (R. Vol. 30, Testimony of Dr. Bernhard) Dr. Bernhard testified to the following, based on her clinical interview of Mach: During the Machs' married life, Mimi experienced episodes of rage during which she would scream at Mach for hours, her behavior escalating in severity when she drank

4

alcohol. During these episodes, Mach would withdraw and attempt to avoid conflict, by staying quiet, or sleeping in a different room. (*Id.*) If Mach attempted to leave, Mimi would accuse him of abandoning his infant daughter and threaten to call the police. (*Id.*)

Dr. Bernhard also spoke to Carol Alleman, one of the directors of the condominium association where the Machs rented who was responsible for resident complaints, and to Mike Rose, a man who worked for the Town of Vail and knew Mach professionally. (R. Vol. 30, Dr. Bernhard testimony) Alleman and Rose corroborated instances of Mimi Mach's behavior that Mach described to Dr. Bernhard. (*Id.*)

Mach told Dr. Bernhard during the clinical interview that Mimi had been drinking during the day on May 29, 1994. At dinner that evening, Mimi became enraged and accused Mach of marrying her for her money, of being "dirty," and sexually incompetent. Mach tried to leave at about 7:30 p.m., but changed his mind after Mimi threatened to call the police. Mach went upstairs to their bedroom at around 8:30 p.m. to escape Mimi's harangue, but she followed him up there and continued to berate him, also claiming that Mach's sister had contracted cancer from sex. Mach then went downstairs to the baby's bedroom where there was an extra bed, but when Mimi followed him down there, he went back upstairs so that Mimi's yelling would not wake the baby. Ultimately, he and Mimi were in bed together in their bedroom, where she continued to yell at Mach, threatened to take their baby away from forever, and told him repeatedly that he was a bad father. Mach got out of bed with the intention of putting on his pants, but instead grabbed the gun out of his night stand and shot Mimi. (*See, generally*, R. Vol. 30, Dr. Bernhard testimony)

Dr. Bernhard opined that Mach had not acted after deliberation but in response to a highly provoking act on the part of the victim.   (R. Vol. 30, Dr. Bernhard testimony)

Dr. Bernhard reached her conclusion about Mach's state of mind at the time of the shooting based on her assessment of his personality, Mach's history of dealing with conflict through repression, and the ongoing provocation and extreme nature of Mimi Mach's rages. (R. Vol. 30, Dr. Bernhard testimony) Dr. Bernhard considered that Mach felt that he had no means of escape from Mimi, and that Mach had been alienated from his only other child from a previous relationship; thus, the threats to take away the child he shared with Mimi were particularly provocative.   (*Id.*) Dr. Bernhard believed that the provocation stretched out over the course of the evening and that Mach was ultimately "forced over the brink." (*Id.*)

Dr. Bernhard testified on cross exam that she knew Mach had told another psychologist that immediately before Mach shot Mimi he thought to himself, "you can't do that," in response to Mimi threatening to take away his daughter. (R. Vol. 30, Dr. Bernhard testimony)  Bernhard opined, however, that because only seconds elapsed between the time Mach had this thought and the shooting, and because Mach was not able to provide much detail about the shooting to Bernhard, "there was [no] indication that [Mach] was reasoning" at the time of the shooting.  (R. Vols. 30, 31, Dr. Bernhard testimony)

B.    The §2254 Petition

Mach filed his §2254 Application on November 25, 2005 asserting the following claims: (1) the trial court violated Applicant's Fourteenth Amendment due process rights by excluding evidence of the victim's character (prior instances of Mimi Mach's rage and

anger); (2) the trial court violated Applicant's Sixth Amendment confrontation rights and Fourteenth Amendment due process rights by excluding testimony from the victim's psychologist about the victim's character and state of mind because of a state statutory privilege; (3) the trial court violated Applicant's Fourteenth Amendment due process rights by excluding blood alcohol test results which showed that the victim's blood alcohol level was twice the legal limit at the time of her death; and (4) the trial court violated Applicant's Fourteenth Amendment due process rights when it instructed the jury erroneously concerning the lesser non included offense of heat of passion manslaughter.

II.

Respondents concede that the Application was timely filed under the Antiterrorism and Effective Death Penalty Act ("AEDPA"),  Pub. L. 104-132, 110 Stat. 1218 (effective April 24, 1996), and that Applicant exhausted state remedies, as required by 28 U.S.C. §2254(b)(1)(A).  Accordingly, I proceed to the merits of Applicant's claims.

Under the AEDPA, a federal district court cannot grant habeas relief on a constitutional claim adjudicated on the merits in the state courts unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. §2254(d)(1) and (2).  In *Williams v. Taylor*, 529 U.S. 362, 405-06  (2000), the Supreme Court held that a state court decision is "contrary to" Supreme Court precedent only when it "arrives at a conclusion opposite to that reached by this Court on a question of law," or if the state court "decides a case differently than this Court has on a set of materially

indistinguishable facts." The state court decision need not cite Supreme Court cases, as long as neither the reasoning nor the result of the state court determination contradicts Supreme Court law. *Early v. Packer*, 537 U.S. 3, 8 (2002). A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 407-08. An application is not unreasonable merely because the habeas court determines it to be incorrect. *Id.* at 411. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*

A.    Exclusion of Evidence of Victim's Character

Applicant first claims that the trial court violated his due process right to present a defense by excluding evidence of the victim's mental health, prior acts of rage, and opinion evidence about the victim's abusive and irrational behavioral traits. Applicant argues that the evidence was probative of his defense that the victim provoked him to shoot her and should have been admitted under Colorado Rule of Evidence ("C.R.E.") 404 or 405.

A defendant's right to due process includes the right to present witnesses in his own defense. *Washington v. Texas*, 388 U.S. 14, 18-19 (1967). However, "[t]he accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Martin v. Egelhoff,* 518 U.S. 37, 42 (1996)(quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).

Before trial, Applicant filed a motion in limine seeking to introduce C.R.E. 404/405 evidence from the following witnesses: (1) Tim Palmer, Mimi Mach's former husband who she divorced in 1981, who would testify about specific instances during their marriage in which he was the target of episodes of rage by Mimi which were usually prompted by her consumption of alcohol; (2) Sheila Rowland, who had observed Mimi Mach engage in "violent interactions" with Mach and Mach's response; Rowland described Mimi as "wailing" on Mach on one occasion, and Mach as "sitting and taking it"; (3) Eric Chevasson, who had been in a long-term relationship with Mimi Mach in the 1980's, would testify that he maintained a separate residence because of her episodes of rage directed at him; (4) Officer McCroskey, who would testify that when he arrested Mimi Mach in Florida in 1992, she was intoxicated and angrily attacked the officer and her male companion; and (5) psychologist John Lincoln, who counseled Mimi Mach in 1993, would testify that Mimi suffered from borderline personality disorder which caused her to display inappropriate intense anger and verbal outbursts in an attempt to avoid real or imagined abandonment.    (Respondents' Ex. A, at 6-7, citing R. Vol. 22, at 342, 451-52; Respondents' Ex. B, citing R. Vol. 18, at 4-6)

The trial court ruled that the proffered testimony from Dr. Lincoln about the victim's mental health was privileged and would not be admitted absent a waiver,[3] and that the proffered testimony of the other witnesses was remote in time, was irrelevant, and that any probative value was outweighed by unfair prejudice.  (R. Vol. 25, December 12, 2000 Hearing, at 33-37)

---

[3]The exclusion of Dr. Lincoln's testimony is addressed in Section II.B., *supra*.

On direct appeal of Applicant's conviction, the Colorado Court of Appeals held that the trial court properly excluded past instances of Mimi Mach's prior acts of rage and anger under C.R.E. 404(a) and 405 because the evidence was not an essential element of Mach's claim that he acted upon a sudden heat of passion.[4]  (Respondents' Ex. D) The court further held that Applicant's remaining grounds for admission of the evidence were subject to plain error analysis because they were not presented to the trial court. (*Id.*)  The Colorado Court of Appeals concluded that the evidentiary errors, if any, did not constitute plain error:

> The evidence was circumstantial as to the events surrounding the killing, and the specific instances of conduct were quite remote from the time of the offense.  Direct evidence of the events defendant claimed constituted highly provoking acts was presented to the jury through defendant's statements to the police and the testimony of the victim's daughter. Additionally, through the testimony of the expert psychologist, defendant presented evidence of his volatile relationship with the victim and the events on the day of the killing.
>
> Accordingly, we conclude that the errors, if any, did not undermine the fundamental fairness of the trial and would not require reversal.

(Respondents' Ex. D, at 4-5)

---

[4]Evidence of a person's character is not generally admissible to prove that he or she acted in conformity therewith.  C.R.E. 404(a).  One exception to this general rule is "[e]vidence of a pertinent trait of character of the alleged victim of the crime offered by the accused." C.R.E. 404(a)(2).  Character can be proved by evidence of reputation, opinion evidence, and "in cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct." C.R.E. 405.

Cumulative provocation was not a basis for heat of passion manslaughter as that crime was defined on the date of Applicant's offense. COLO.REV.STAT. ("C.R.S.") §18-3-104(1)(c) (1994); *Coston v. People*, 633 P.2d 470, 472 (Colo. 1981)(defining elements of heat of passion manslaughter).

Colorado's plain error test is rooted in due process.  *See People v. Kruse*, 839 P.2d 1, 3 (Colo. 1992)("Plain error occurs when review of the entire record reveals that the error so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction.")(internal citations and quotations omitted) Because there is no practical distinction between Colorado's plain error test and the federal due process test, which requires reversal when error "so infused the trial with unfairness as to deny due process of law," *Estelle v. McGuire*, 502 U.S. 62, 75 (1991), the AEDPA deferential standard of review applies unless the  Colorado Court of Appeals unreasonably applied federal due process law. *See Thornburg v. Mullin,* 422 F.3d 1113, 1124-25 (10th Cir. 2005)(citing 28 U.S.C. § 2254(d)).

I recommend finding that the CCA's decision was not contrary to, or an unreasonable application of, Supreme Court due process jurisprudence.  The specific acts of rage which Applicant sought to admit from witnesses Tim Palmer, Eric Chevasson and Officer McCroskey were remote in time to the shooting.[5]  Applicant described the conduct which he claimed constituted the relevant provoking acts to law enforcement officers and to his psychologist who testified to those accounts at trial.  The psychologist also told the jury about Mach's difficult relationship with Mimi Mach.

In addition, Mimi Mach's daughter, Aime Palmer, testified that Mimi and the Applicant were arguing on the night of the shooting and that they argued at least once a month with Mimi being the verbal aggressor.  There was also evidence that Mimi Mach had

---

[5]The state court record does not reflect when proffered witness Rowland observed Mimi Mach "wailing" on the Applicant.

11

been drinking on the night of the shooting. Aime Palmer testified that her mother had "likely" drank wine at dinner that evening and officers found three "mostly empty" wine bottles in the Mach's home."   (R. Vol. 28, Palmer testimony; McWilliam testimony) Applicant also told police officers and his psychologist that Mimi Mach had been drinking heavily that day. A forensic toxicologist testified that she reviewed some computer notes Mimi Mach typed that evening and concluded that Mimi Mach was moderately drunk and was demonstrating irrational behavior.  (R. Vol. 30, Testimony of Dr. Kathy Verdeal) Dr. Verdeal further testified that alcohol fuels aggressive behavior and that Mimi Mach's computer notes showed "aggression," "hostility" and a "lack of control." (*Id.*)

Claim One should be denied because, as the Colorado Court of Appeals found, the trial court's exclusion of evidence of Mimi Mach's prior acts of rage, even if erroneous, did not undermine the fundamental fairness of Applicant's trial.

B.   Exclusion of Evidence of Victim's Mental Health Because of Statutory Privilege

Applicant next claims that the trial court violated his Fourteenth Amendment due process right to present a defense and his Sixth Amendment right to confront the witnesses against him by excluding the testimony of Dr. Lincoln, a clinical psychologist with whom Mimi Mach had individual counseling sessions in 1993. (R. Vol. 30, Testimony of Dr. John Lincoln)

Applicant alleges that Dr. Lincoln diagnosed Mimi Mach with Borderline Personality Disorder as a result of their counseling sessions.  (§2254 Application, at 6; Respondent's Ex. A, at 7) During Applicant's first trial, the court allowed Dr. Lincoln to testify that Mimi Mach exhibited the following character traits: "manipulation, seductiveness, deceit, control,

anger, denial, paranoia, an effort to be charming, and hysterical quality" (§2254

Application, at 6).[6] At Applicant's second trial, the court excluded Dr. Lincoln's testimony

about his observations and communications with Mimi Mach during therapy sessions, and

Dr. Lincoln's assessment and diagnosis of the victim, as barred by the Colorado patient-

psychologist privilege because the defense did not procure a valid waiver.  (R. Vol. 25,

December 12, 2000 Motions Hearing, at 35; January 5, 2001 Motions Hearing, at 44-47)

Dr. Lincoln thus testified only that he held two individual counseling sessions with Mimi

Mach as well as a few joint counseling sessions with her and the Applicant in the year or

so before Mimi Mach's death. (R. Vol. 30, at 36-41)

In Colorado, the psychologist-patient privilege is codified in §13-90-107(1)(g),

C.R.S. (2003).  That section states:

> (g) A licensed psychologist . . . or unlicensed psychotherapist shall not be examined [as a witness] without the consent of such licensee's or unlicensed psychotherapist's client as to any communication made by the client to such licensee or unlicensed psychotherapist, or such licensee's or unlicensed psychotherapists's advice given thereon in the course of professional employment . . .

Once the psychologist-patient privilege attaches, "the only basis for authorizing a

disclosure of the confidential information is an express or implied waiver."  *People v.*

*District Court*, 719 P.2d 722, 727 (Colo. 1986).

On direct review of Applicant's conviction, the Colorado Court of Appeals held that

a valid waiver by the patient was the only basis for authorizing a disclosure under the

---

[6]However, the first trial court excluded as privileged evidence of Dr. Lincoln's diagnoses, communications with Mimi Mach and Dr. Lincoln's observations of her during their sessions. (Application, at 6, and attachment, at 1-2)

patient-psychologist privilege, rejecting the Applicant's arguments that the privilege should have been abrogated because the probative value of Dr. Lincoln's testimony outweighed the patient's privacy interests, and that the trial court's exclusion of Dr. Lincoln's testimony violated Applicant's Sixth Amendment confrontation rights.  (Respondents' Ex. D, *People v. Mach*, 01CA1182 (Decided September 30, 2004)).

In support of his claim that the trial court violated his right to present a defense in enforcing the state patient-psychologist privilege, Applicant relies on *United States v. Hansen*, 955 F.Supp. 1225, 1226 (D.Mont. 1997), wherein the district court concluded that the defendant's need for mental health treatment records held by the victim's former psychologist warranted abrogation of the psychologist-patient privilege. *Id*. The court reasoned that the mental and emotional condition of the victim was highly relevant to the defendant's claim of self-defense and outweighed the privilege-holder's privacy interest in preserving the privilege after her death.  *Id.*  The court noted that several states had created statutory exceptions authorizing psychologists to release records after a patient's death "if the patient's mental or emotional condition is an element of a claim or defense." *Id.*

Applicant's argument might be persuasive if this federal habeas court was reviewing his claim de novo.  Under the AEDPA, however, federal review is highly deferential. The court's inquiry is limited to whether the Colorado Court of Appeal's decision was contrary to, or an unreasonable application of, United States Supreme Court law.

In *Jaffee v. Redmond*, 518 U.S. 1 (1996), the Supreme Court concluded that a psychotherapist privilege contained in Fed.R.Evid. 501 precludes disclosure of confidential

communications made to licensed psychiatrists, psychologists and licensed social workers in the course of psychotherapy. *Id.* at 15. The Court held that the privilege was absolute and could not be made contingent upon "a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure" without eviscerating the effectiveness of the privilege. *Id.* at 17. The Supreme Court cautioned, however, that "[b]ecause this is the first case in which we have recognized a psychotherapist privilege, it is neither necessary nor feasible to delineate its full contours in a way that would govern all conceivable future questions in this area." *Id.* at 18 (internal citation and quotation omitted)

The Supreme Court did not hold in *Jaffee* that a trial court must abrogate a patient-doctor or patient-psychologist privilege if application of a balancing test weighs in favor admitting the privileged information at trial. Further, there is no such exception in the Colorado statute.

In *United States v. Scheffer*, 523 U.S. 303, 308 (1998), the Supreme Court held that a criminal defendant's right to present evidence in his own defense is subject to reasonable government-imposed restrictions, so long as such restrictions are not "arbitrary" or "disproportionate to the purposes they are designed to serve." (internal quotation marks and citations omitted). The exclusion of evidence is arbitrary or disproportionate only where it has infringed upon a "weighty interest of the accused." *Id.* (citations omitted)

In *Scheffer*, the Supreme Court held that Military Rule of Evidence 707, which makes polygraph evidence inadmissible in court-marital proceedings, did not

unconstitutionally abridge the right of an accused member of the military to present a defense because the rule served several legitimate interests[7] in the criminal trial process and was neither arbitrary nor disproportionate in promoting those ends. *Id.* at 309. The Court determined that the rule did not implicate a sufficiently weighty interest of the defendant to raise a constitutional concern because the rule did not preclude him from introducing any <u>factual</u> evidence, or from testifying on his own behalf. *Id.* at 316-17. Instead, the defendant was barred from introducing expert opinion testimony to bolster his own credibility. *Id.* at 317.

Here, Colorado's statutory psychologist-patient privilege serves the legitimate state interest of encouraging a patient's full disclosure to health care professionals by guaranteeing patient privacy. *See Riss & Co. v. Galloway*, 114 P.2d 550, 553 (Colo. 1941); *Stauffer v. Karabin*, 492 P.2d 862, 864 (Colo. App. 1971). I recommend finding that the trial court's enforcement of the psychologist-patient privilege on behalf of Mimi Mach did not infringe upon a sufficiently weighty interest of the Applicant so as to raise a constitutional concern. As in *Scheffer*, Applicant was not precluded from introducing factual evidence relevant to the charged offense; the excluded testimony of Dr. Lincoln was expert opinion testimony about Dr. Lincoln's diagnosis and assessment of the victim's mental health, and Dr. Lincoln's observations about the victim's character traits approximately one year before the victim's death. Dr. Lincoln's testimony would have served only to "bolster [Applicant's] own credibility." *Scheffer*, 523 U.S. at 1269. Further, Applicant was not prevented from

---

[7]The legitimate interests recognized by the Supreme Court included ensuring that only reliable evidence is introduced at trial, preserving the court members' role in determining credibility, and avoiding litigation that is collateral to the primary purpose of trial. 523 U.S. at 309.

testifying on his own behalf at trial. I recommend finding that the exclusion of Dr. Lincoln's testimony did not significantly impair Applicant's defense.

I next address Applicant's claim that the exclusion of Dr. Lincoln's testimony violated Applicant's Sixth Amendment confrontation rights.

Plaintiff also asserts that the trial court refused to allow Dr. Lincoln to provide impeachment and rebuttal testimony after certain of the victim's hearsay statements were admitted at trial. Specifically, a Colorado State Patrol dispatcher and an Eagle County law enforcement officer testified for the prosecution that they had telephone conversations with Mimi Mach on the night of the shooting during which Mimi inquired about the procedure for obtaining a restraining order. (R. Vol. 31, Testimony of Pamela Stewart, Flint Chambers) The dispatcher testified that Mimi sounded "distressed" and "upset," but did not want an officer to come by her residence and that everything was "fine." (*Id.*) The dispatcher also stated that Mimi did not sound angry, her speech was not slurred, and that her questions and answers were rational and coherent. (*Id.*, Stewart testimony) The officer asked Mimi if there had been any physical violence, and Mimi responded that there had only been "verbal abuse." (*Id.*, Chambers testimony) The officer also stated that Mimi seemed "calm," did not sound intoxicated, and that he did not believe there was a need to send an officer to her residence. (*Id.*)

Applicant argues that Dr. Lincoln's proffered expert testimony that Mimi Mach was deceitful and manipulative and that she suffered from a borderline personality disorder manifested by such traits was necessary to impeach Mimi Mach's credibility.

The Sixth Amendment Confrontation Clause guarantees a criminal defendant the opportunity to cross examine the witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)(citing *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)). Cross examination is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Davis* 415 U.S. at 316; *see*, *also*, *Pennsylvania v. Ritchie*, 480 U.S. 673, 678 (1987)("[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable.")

Here, however, Applicant's Sixth Amendment claim is misplaced. If a Sixth Amendment violation occurred, it was not because the trial court excluded Dr. Lincoln's testimony. Instead, the violation could only have occurred because Applicant was denied the right to confront the witness against him - Mimi Mach.   However, Applicant does not claim in his §2254 Application that he was denied his Sixth Amendment right to confront Mimi Mach because he did not have an opportunity to cross examine her, nor did he exhaust such a claim in the state courts.  Accordingly, I do not address the merits of that claim here.

Applicant's claim that the trial court's exclusion of Dr. Lincoln's testimony about Mimi Mach's mental health and character traits violated Applicant's Sixth Amendment confrontation rights should be denied because the CCA's decision rejecting that claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

Claim two should be denied in its entirety.

C.    Trial Court's Exclusion of Blood Alcohol Test Results

Applicant next claims that the trial court violated his Fourteenth Amendment due process rights by excluding test results which showed that the victim's blood alcohol level (.138) was beyond the presumptive level of intoxication established by Colorado statute during the relevant time period.[8]

Mach told the police and Dr. Bernhard that his wife had been drinking heavily the night of the shooting and that she became more irrational when she was intoxicated. (R. Vols. 28 and 29, McWilliam Testimony; R. Vol. 30, Dr. Bernhard Testimony) Dr. Verdeal, a forensic toxicologist called by the defense, testified about the impact of drinking large amounts of alcohol on individual's mood and emotions. (R. Vol. 30, Testimony of Dr. Kathy Verdeal, at 66-67) Dr. Verdeal testified that aggression fueled by alcohol in women usually results in drawn out expressions of anger. (*Id.* at 67-70) Based on her review of the computer notes Mimi Mach typed on the night of the shooting, Dr. Verdeal opined that Mimi was moderately intoxicated and was exhibiting illogical, irrational behavior," a "lack of control," that Mimi's thought processes were confused, and that Mimi was experiencing a lot of "mood and emotion." (*Id.* at 71-74)

Applicant argues that evidence of Mimi Mach's blood alcohol level would have aided the jury in considering Dr. Verdeal's testimony, in assessing Mimi's behavior on the night of the shooting, and in determining whether there had been a highly provoking act. Applicant further contends that the blood alcohol test results would have also corroborated

---

[8]The presumptive level of intoxication under Colorado law at the time of the victim's death in 1994 and at the time of Applicant's trial in 2001 was a blood alcohol level of 0.10 or more. *See* C.R.S. §42-4-1202 (2)(c)(1994); §42-4-1301(5)(c)(2001).

the defense's assertion that Mimi had been drinking heavily that night and would have rebutted the testimony of the Colorado State Patrol dispatcher and Eagle County law enforcement officer who talked to Mimi on the telephone and who testified that she did not sound intoxicated.

Applicant also maintains that the trial court's exclusion of the evidence was reversible error because no evidence was presented at trial to show the actual level of Mimi Mach's intoxication. Other than Dr. Verdeal's opinion, the only evidence of Mimi's intoxication was Detective McWilliam's testimony that Mach told him that Mimi had been drinking and that three half empty one liter wine bottles were found in a trash can in the living room and kitchen area of the Machs' town home.

The Colorado Court of Appeals held that even if the trial court abused its discretion in excluding evidence of the victim's blood alcohol level under §16-3-309, C.R.S.,[9] the error was harmless because there was substantial evidence presented to the jury about the victim's intoxication.  (Respondents' Ex. D)   The Colorado Court of Appeals cited the following evidence:

> A witness testified that the victim most likely drank wine at dinner the night of the murder.  An officer testified that officers found three mostly empty wine bottles in the kitchen and a

---

[9]Under §16-3-309(5), C.R.S., a party to a criminal proceeding may introduce into evidence "any report or finding of a criminalistics laboratory . . . with the same force as if the laboratory technician had testified in person."  The statute further provides either party may request that technician testify in person by notifying witness and opposing party ten days prior to trial.

At Applicant's trial, the victim's blood alcohol test results were incorporated into the coroner's autopsy report. (R. Vol. 29, at 208-221) When the defense asked the prosecution's expert in forensic pathology about the victim's blood alcohol level on cross examination, the prosecution objected for lack of foundation, arguing that the expert was not the person who conducted the test and therefore could not testify about the results.  (*Id.* at 221-222) The trial court sustained the objection and also excluded the autopsy report. (*Id.* at 222, 244-45)

wine glass with lipstick on it in the room with the victim.  This officer also testified that defendant had told him that the victim had been intoxicated that night.  An expert in forensic toxicology examined certain writings made by the victim the night of the murder and concluded that the victim was `in the middle range of intoxication.'  Finally, a psychologist testified that during an evaluation, defendant said that the victim was `drinking a great deal' and that she had been `drinking a lot on the day' of the murder.

(Respondents' Ex. D, at 8-9)

As discussed previously, a state trial court's evidentiary rulings do not warrant federal habeas corpus relief unless the error "so infused the trial with unfairness as to deny due process of law." *Estelle*, 502 U.S. at 75.

I recommend finding that the Colorado Court of Appeals' decision was not contrary to, or an unreasonable application of, *Estelle*.[10]  Although most of the evidence concerning the victim's alcohol intake on the night of the shootings was based on statements made by the Applicant, an expert forensic toxicologist testified that she examined notes typed by the victim that night and concluded that the victim was "in the middle range of intoxication where you have illogical, irrational behavior." (R. Vol. 30, Dr. Verdeal Testimony, at 71)  The victim's daughter also testified that her mother likely had been drinking wine at dinner and officers found three mostly empty wine bottles in the Mach's home.  Accordingly, even if the jury was not told that Mimi Mach was "legally

---

[10]Under Colorado law, an error is deemed harmless where "viewing the evidence as a whole, the error did not substantially influence the verdict or impair the fairness of the trial."  *Medina v. People*, 114 P.3d 845, 857 (Colo. 2005)(citations omitted).

drunk," there was sufficient evidence from which the jury could have concluded that the victim was intoxicated on the night of the shooting.

Accordingly, Applicant's third claim should be denied.

D.     Unconstitutional Jury Instruction

Finally, Applicant claims that his due process rights were violated because the jury instructions did not allow the jury to select heat of passion manslaughter as its verdict. Applicant argues that the jury should have been give a separate verdict form requiring the jury to determine whether Applicant acted in the heat of passion when he shot his wife. Applicant further contends that the instruction did not allow the jury to select heat of passion manslaughter as its verdict, regardless of whether it had also found him guilty of first or second degree murder.

At the time of Applicant's offense in May 1994, heat of passion manslaughter was a separate offense in the homicide statutes, *see* C.R.S. §18-3-104(1)(c)(1994), and was a lesser, non included offense of second degree murder.  *See Walker v. People*, 932 P.2d 303, 308 (Colo. 1997).   At trial, the defense tendered its instructions to conform to the 1996 amendments to the homicide statutes which eliminated heat of passion manslaughter as a separate offense and instead established heat of passion as a factor in mitigation of second degree murder within the second degree murder statute.  *See* §18-3-103(3)(b)(1996), C.R.S.[11]

_____

[11]In *People v. Garcia*, 28 P.3d 340, 345 (Colo. 2001), the Colorado Supreme Court construed §18-3-103(3)(b)(1996) and held that "the General Assembly intended for a jury to consider the issue of provocation after determining that a defendant is guilty of second-degree murder."  Thus, under the post-1996 statutory scheme, a jury must be told that it can consider the issue of provocation as a mitigating factor (assuming the evidence supports such an instruction), even though it had already determined that a defendant was guilty of second degree murder, because heat of passion is a mitigator, not a separate

The trial court denied defense counsel's requests for a special interrogatory to inform the jury about the heat of passion "mitigator" and for a special verdict form which would have required the jury to make a specific finding regarding whether the prosecution had proven lack of provocation. (R. Vol. 28, at 176-180; Vol. 31, at 113-129)  Instead, the trial court followed *Walker* and instructed the jury to determine whether Applicant committed the lesser non included offense of heat of passion manslaughter. (Respondents' Ex. B, People's Answer Brief, at 30 (citing R. Vol. 23, at 741-42))  The court further instructed the jurors that they may not find the Applicant guilty of more than one of the following crimes: murder in the first degree, murder in the second degree, manslaughter – provoked passion.  (*Id.* at 31 (*id.*))  The court provided the jury with one jury verdict form which allowed the jury to find the Applicant not guilty, or, to find Applicant guilty of <u>one</u> of the following offenses: murder in the first degree, murder in the second degree, or manslaughter – provoked passion.  (*Id.* (citing R. Vol. 23, at 746))

Applicant argued to the Colorado Court of Appeals that the jury instruction did not conform to the instruction given in *Walker* and that the court should have given the jury a separate verdict form for the heat of passion manslaughter offense, in addition to the verdict form for the offenses for first degree and second degree murder.  (Respondents Ex. A)

In *Walker,* the jury was instructed on first degree murder, second degree murder, reckless manslaughter and heat of passion manslaughter.  The jury received two verdict forms: one requiring the jury to return a verdict on first degree murder or one of the lesser

offense. *Garcia*, 28 P.3d at 345-46.

included offenses of second degree murder or reckless manslaughter; the other required the jury to consider separately the defendant's innocence or guilt on the heat of passion manslaughter offense.  932 P.2d at 305.  The jury was thus instructed to make a finding on the heat of passion manslaughter offense regardless of its decision on the other counts. *Id.*

In Applicant's direct appeal, the Colorado Court of Appeals, relying on *Mata-Medina v. People*, 71 P.3d 973 (Colo. 2003), concluded that even if there was an error in the jury instructions, there was no reasonable probability that the error contributed to the Applicant's first degree murder conviction.  (Respondents' Ex. D)   In *Mata-Medina*, the Colorado Supreme Court held that where the jury receives an intermediate offense instruction, but convicts on the greater offense, the failure to give a lesser offense instruction is not inherently prejudicial because "'jury convictions for a certain charged offense inherently constitute a rejection of offered lesser offenses.'" (Respondents' Ex. D, at 10 (quoting *Mata-Medina,* at 981-82). The CCA determined that the jury implicitly rejected the intermediate offense of second degree murder when it convicted Applicant of first degree murder.  The CCA thus reasoned that the jury's implicit rejection of second degree murder further implied that the jury would also reject an offense of even lesser culpability – in this case, heat of passion manslaughter.  (Respondents' Ex. D, at 10-11) The CCA found that the presumed rejection was strengthened by the fact that the mental culpability element for both second degree murder and heat of passion manslaughter is "knowingly."  (*Id.* at 11)

"In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)(citing *Sandstrom v. Montana*, 442 U.S. 510, 520-521, (1979)).   Otherwise, an erroneous jury instruction does not entitle a petitioner to federal habeas corpus relief unless "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)(internal quotations and citations omitted).

Applicant represented in his Opening Brief to the Colorado Court of Appeals that Instruction No. 15 "set forth the elements of heat of passion manslaughter" and instructed the jury that the prosecution had the burden to prove each element of that crime beyond a reasonable doubt.[12]  (Respondents' Ex. A, at 34-35)  Accordingly, to be entitled to federal habeas corpus relief, Applicant must show that the trial court's failure to provide the jury with an instruction that conformed with *Walker* and a separate verdict form for heat of passion manslaughter was so fundamentally unfair as to deny the petitioner due process. *Middleton, supra.*

I recommend finding that Applicant has failed to demonstrate that the asserted errors rendered his trial fundamentally unfair. As discussed above, at the time of Applicant's offense, heat of passion manslaughter was a separate offense, not a mitigator to second degree murder.   Although Applicant complains that his instruction and verdict

---

[12]The state district court mistakenly failed to include the jury instructions in the state court record transmitted to this court.   Accordingly, I refer to the relevant instructions as cited and quoted in the Applicant's and State's appellate briefs to the Colorado Court of Appeals.  I note that Applicant does not claim that the State misrepresented the elements of the offense of heat of passion manslaughter in the jury instructions.

form did not conform *in toto* to those given in the *Walker* case, the Colorado Supreme Court did not even address the appropriateness of the jury instructions in *Walker*.[13] Here, the jury was specifically instructed to consider heat of passion manslaughter as a separate offense. "In addition to determining the issues related to the charge of first degree murder and the lesser included offense of second degree murder, the jury shall determine whether the defendant committed the lesser non-included offense of heat of passion manslaughter." (Respondents' Ex. B, at 30 (quoting Jury Instruction 15))  The jury was also instructed that it might find the defendant not guilty of any of the charged offenses, but if it found the defendant guilty, it could only convict him of one offense.  (*Id.*)  Further, the jury was told in the verdict form to return a verdict for one of the three charged offenses - first degree murder, second degree murder, or provoked passion manslaughter.

Moreover, Applicant emphasized that the shooting was provoked by the victim throughout his evidentiary presentation and in closing argument.  There is no reasonable probability that the jury failed to consider whether the Applicant acted under heat of passion when the jury rendered its verdict.  Accordingly, I recommend finding that the Court of Appeals decision was not contrary to, or an unreasonable application of, *Henderson v. Kibbe*, because any error in the jury instructions did not so infect the trial as to result in a violation of Applicant's due process rights. Applicant's fourth claim for relief should be denied.

---

[13]The Colorado Supreme Court granted certiorari on two issues: (1) Whether the CCA erred in concluding that under the Colorado statutory scheme heat of passion is not a factor in mitigation of second degree murder? and (2) whether the burden of proving heat of passion in a homicide case was in effect placed upon the defendant in violation of due process of law?  *Walker*, 932 P.2d at 304, n.1.

III.

For the reasons set forth above, it is

**RECOMMENDED** that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. §2254, filed by Robert S. Mach on November 25, 2005, be **DENIED**.  It is

**FURTHER RECOMMENDED** that the §2254 Application be **DISMISSED WITH PREJUDICE.**

**Within ten days after being served with a copy of the proposed findings and recommendation, any party may serve and file written objections to the proposed findings and recommendation with the Clerk of the United States District Court for the District of Colorado.  The district judge shall make a de novo determination of those portions of the proposed findings or specified recommendation to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the proposed findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.**

**Failure to make timely objections to the magistrate judge's recommendation may result in a waiver of de novo review of the recommendation by the district judge and may also waive the right to appeal from a judgment of the district court based on the findings and recommendations of the magistrate judge.**

Dated November 20, 2006.

BY THE COURT:

s/ Gudrun J. Rice *for*
PATRICIA A. COAN
United States Magistrate Judge

27